The CALABRIAN CORPORATION, Plaintiff,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION, Defendant,

and

William Blythe & Co., Ltd., and BASF Corporation, Defendants–Intervenors.

No. 90–09–00481.

United States Court of International Trade.

May 13, 1992.

Brownstein Zeidman & Schomer, Steven P. Kersner and Ronald M. Wisla, Washington, D.C., on the motion, for plaintiff.

Lyn M. Schlitt, General Counsel, James A. Toupin, Assistant General Counsel, U.S. Intern. Trade Com'n, Elizabeth C. Hafner, Washington, D.C., on the motion, for defendant.

Dow, Lohnes & Albertson, William Silverman and Ryan Trainer, and Steptoe & Johnson, Richard O. Cunningham and Jay H. Reiziss, Washington, D.C., on the motion, for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

Plaintiff, Calabrian Corporation ("Calabrian"), contests the negative preliminary injury determination issued by the United States International Trade Commission ("Commission") in *Certain Sodium Sulfur Chemical Compounds from the Federal Republic of Germany, the People's Republic of China, Turkey and the United Kingdom,* USITC Pub. 2307, Inv. Nos. 701–TA–303, 731–TA–465–468 (Prelim.) (Aug. 1990) ("Determination") with respect to imports of sodium metabisulfite. The determination was published in the Federal Register. 55 Fed.Reg. 35,373 (Aug. 29, 1990). This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(1)(C) (1988).

Plaintiff challenges the Commission's findings that sodium metabisulfite and sodium bisulfite constitute a single like product and the Commission's determination that there is no reasonable indication of material injury or threat of material injury by reason of allegedly subsidized and less than fair value imports of sodium metabisulfite from the Federal Republic of Germany, the People's Republic of China, Turkey, and the United Kingdom.

On the facts presented, this Court denies the Plaintiff's Motion for Judgment Upon the Agency Record and sustains the negative preliminary determinations of the Commission in its investigations of sodium metabisulfite from the People's Republic of China, the Federal Republic of Germany, Turkey, and the United Kingdom in all respects. This Court holds that the Commission did not abuse its discretion: (1) in applying the proper legal standard, (2) in finding sodium metabisulfite and sodium bisulfite to be single like products, (3) in declining to take into account the conditions of individual firms operating within the domestic industry, and (4) in concluding there was no reasonable indication of material injury or threat of material injury to the domestic market.

## BACKGROUND

On July 9, 1990, Plaintiff filed a petition with the Commission and the United States Department of Commerce ("Commerce") alleging that an industry in the United States was materially injured, or threatened with material injury by reason of less than fair value (LTFV) imports of sodium metabisulfite and sodium thiosulfate, in their dry or liquid form, from the Federal Republic of Germany, the People's Republic of China, Turkey, and the United Kingdom ("subject countries") and by subsidized imports of sodium metabisulfite and sodium thiosulfate from Turkey.

Pursuant to sections 703 and 733 of the Tariff Act of 1930, the Commission instituted and conducted preliminary investigations. 19 U.S.C. §§ 1671b(a) and 1673b(a) (1988). As part of these investigations, the Commission sent questionnaires to all known United States producers and importers of sodium metabisulfite. A public conference was held in July 1990, during which all interested parties and their counsel were permitted to present testimony and to respond to questions from the Commission's staff. The parties thereafter were permitted to submit post-conference briefs and comments on business proprietary information. A staff report, containing a summary of the information obtained in the course of these investigations, was submitted to the Commission on August 15, 1990. On August 21, 1990, the Commission made its determination and on August 29, 1990, issued its opinion. Determination, USITC Pub. 2307, Inv. Nos. 701–TA–303, 731–TA–465–68 (Prelim.) (Aug. 1990).

The Commission determined that there were two domestically produced products like the merchandise subject to the investigations, namely, sodium metabisulfite, in dry or liquid form, and sodium thiosulfate, in dry or liquid form. Determination at 6–11 n. 9. Consequently, the Commission determined there were two domestic industries, one producing sodium metabisulfite in dry and liquid form and the other producing sodium thiosulfate in dry and liquid form. *Id.* at 10–11. As to sodium metabisulfite, in dry or liquid form, the Commission determined that there was no reasonable indication that a domestic industry was materially injured or threatened with material injury by reason of allegedly subsidized imports from Turkey, or by reason of allegedly less than fair value imports from the subject countries.[1] As to the sodium thiosulfate, however, the Commission determined that there was a reason-

able indication of material injury to a domestic industry by reason of allegedly less than fair value and subsidized imports.[2] The Commission's preliminary determination concerning imports of sodium thiosulfate is not the subject of this action.

## STANDARD OF REVIEW

 In this civil action, Plaintiff challenges the Commission's determination that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of imports of sodium metabisulfite from the Federal Republic of Germany, the People's Republic of China, Turkey, or the United Kingdom.

The standard of review of negative determinations by the Commission in preliminary investigations is whether the determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(a)(1)(C) and (b)(1)(A) (1988). The Supreme Court has defined this standard of review as follows:

> Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), *quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

---

**1.** Chairman Brunsdale dissented in part, determining that there was a reasonable indication of material injury to the domestic industry by reason of less than fair value imports of sodium metabisulfite from the Federal Republic of Germany and the United Kingdom. Determination at 25. Chairman Brunsdale, however, did concur in the majority's conclusion regarding the

like product determination and the condition of the domestic industries. *Id.* at 25 n. 1.

**2.** Because the Commission majority found in the affirmative concerning sodium thiosulfate, that investigation was continued to a final investigation. 55 Fed.Reg. 45,870 (Oct. 31, 1990) (Notice of Final Investigation).

In addition, Congress has emphasized that review of Commission determinations under the arbitrary and capricious standard is not a *de novo* review.

> Section 516A would make it clear that traditional administrative law principles are to be applied in reviewing antidumping and countervailing duty decisions where by law Congress has entrusted the decision-making authority in a specialized, complex economic situation to administrative agencies. Thus, review of any determination listed in subsection (a)(1) would be to ascertain whether there was a rational basis in fact for the determination by the administrative decision-maker.

S.Rep. No. 249, 96th Cong., 1st Sess. 252 (1979); *see American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 58–59, 785 F.2d 994, 1004 (1986).

The Court's examination of whether the agency has articulated the requisite rational connection between the facts found and the choice made must be measured in terms of the legal standard for preliminary determinations:

> based upon the best information available to [the Commission] at the time of the determination, of whether there is a reasonable indication that—
>
> > (1) an industry in the United States—
> >
> > > (A) is materially injured, or
> > >
> > > (B) is threatened with material injury, or
> >
> > (2) the establishment of an industry in the United States is materially retarded,
>
> by reason of imports of the merchandise which is the subject of the investigation by the administering authority.

19 U.S.C. § 1673b(a) (1988); *see American Lamb*, 4 Fed.Cir. (T) at 56, 785 F.2d at 1002.

The United States Court of Appeals for the Federal Circuit in *American Lamb* addressed both the purpose and standard of review in negative preliminary determinations. The Court recognized that "[t]he purpose of a preliminary injury determination is to 'eliminate unnecessary and costly investigations which are an administrative

burden and an impediment to trade.'" *Id.* at 57, 785 F.2d at 1002–03 (quoting S.Rep. No. 1298, 93rd Cong., 2d Sess. 171). The Court further approved the Commission's view that a "reasonable indication" means more than a finding that there is a possibility of material injury and held that the Commission is empowered to weigh the evidence obtained during a preliminary investigation to determine if that evidence demonstrates that a reasonable indication of material injury or threat of material injury exists. *Id.* at 55–56, 785 F.2d at 1001–02.

In *American Lamb* the Court upheld the Commission's longstanding standard of determination under which no reasonable indication of material injury or threat of material injury exists if:

> (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.

*Id.* at 54–55, 785 F.2d at 1001.

In applying the reasonable indication standard, as interpreted in *American Lamb*, this Court has emphasized that review of a preliminary negative determination must conform to the principles set forth above.

> [N]ot only must the court avoid substituting its judgment for that of the agency, it may reverse the agency's action only where there is 'a clear error of judgment' and where 'there is no rational nexus between the facts found and the choices made.'

*Jeannette Sheet Glass Corp. v. United States*, 11 CIT 10, 15, 654 F.Supp. 179, 183 (1987) (citations omitted).

As to the burden of proof, the statute provides that "the decision of … the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision." 28 U.S.C. § 2639(a)(1) (1988). This Court has held plaintiffs to that standard. *Trent Tube Div., Crucible Materials Corp. v. United States*, 14 CIT

——, 752 F.Supp. 468, 472 (1990). Hence, Plaintiff in this case bears the burden of establishing that the Commission's determination is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. For the reasons set forth below, this Court finds that Plaintiff has failed to meet its burden.

## DISCUSSION

### A. The Commission's Like Product Determination

■ At issue here are two chemicals: sodium metabisulfite and sodium thiosulfate, in their dry and liquid forms. In the investigations below, Calabrian argued that sodium metabisulfite and sodium thiosulfate, in dry or liquid form, constituted a single like product. A.R.Doc. 1 at 57; *see* Determination at 7 n. 9. Respondents contended that sodium metabisulfite and sodium thiosulfate should be considered as separate like products.[3] Transcript of the Preliminary Conference, July 31, 1990, ("Tr."), A.R.Doc. 45 at 66–77 (Blythe Testimony), 112–14 (BASF Testimony), and 138 (Ak–Kim Testimony); Determination at 8 n. 14. The Commission determined that sodium metabisulfite and sodium thiosulfate are separate like products.[4] That decision is not challenged by Plaintiff in this action.

Plaintiff now argues for the first time before this Court that the Commission should have subdivided sodium metabisulfite into two separate like products, sodium metabisulfite (dry form) and sodium bisulfite (liquid form). This argument, however, was not raised before the Commission by any party, including Plaintiff. Nowhere in the petition, nor at any subsequent point in the investigation, did Plaintiff attempt to distinguish between sodium metabisulfite and sodium bisulfite as separate like products. In fact, quite the contrary, Calabrian repeatedly advocated a finding of a single like product consisting of sodium metabisulfite and sodium thiosulfate, in dry and liquid form. For instance, the petition was filed "[o]n behalf of the United States industry producing sodium metabisulfite and sodium thiosulfate." A.R.Doc. 1 at 1. The merchandise subject to investigation is described in the petition as "sodium bisulfite and sodium thiosulfate in dry or liquid form." *Id.* at 6. Calabrian offered proof at the Commission's hearing that "[t]he sulfur chemical compounds subject to this petition are sodium metabisulfite and sodium thiosulfate." Tr., A.R.Doc. 45 at 12; A.R.Doc. 1 at 57–58. Plaintiff emphasized throughout the investigation that the subject of its concern was sodium metabisulfite and sodium thiosulfate whether in dry or liquid form. When sodium bisulfite is mentioned in the petition, it is parenthetically described simply as the liquid form of sodium metabisulfite. A.R.Doc. 1 at 4. Plaintiff never argued that sodium bisulfite, which was repeatedly described as the liquid form of sodium metabisulfite, should be considered a separate like product.[5]

**3.** Sodium metabisulfite is sold in two forms: sodium metabisulfite (dry) and sodium bisulfite (liquid). Sodium thiosulfate is sold in three forms: anhydrous sodium thiosulfate, sodium thiosulfate pentahydrate, and sodium thiosulfate in solution. As Calabrian did not argue in the investigations below, that the Commission separate the dry and liquid forms of sodium metabisulfite, likewise it did not argue that the Commission distinguish the three forms of sodium thiosulfate.

**4.** The statute defines domestic industry as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (1988). "Like product," in turn, is defined as a "product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10) (1988).

In making its like product determination, the Commission traditionally considers 1) physical appearance and uses, interchangeability between products, 3) channels of distribution, 4) customer and producer perceptions of the articles, 5) common manufacturing facilities and personnel, and price. *See Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom,* USITC Pub. 2185 at 11 n. 8, Inv. Nos. 303–TA–19, 20 (Final) and 731–TA–391–399 (Final) (May 1989).

**5.** In fact, the petition often refers to sodium bisulfite as an irrelevant category and its imports as negligible. A.R.Doc. 1 at 7, 13–15, 61–62.

This Court has repeatedly held that a party may not reverse the position it took before the agency and raise contrary arguments on appeal, explaining that "to allow plaintiffs to change their position at this time would deny the Commission the opportunity to review plaintiffs' arguments during the time period prescribed by statute as well as deprive the other parties of their right to respond to plaintiffs' position." *Trent Tube Div., Crucible Materials Corp. v. United States*, 14 CIT ——, ——, 741 F.Supp. 921, 929 (1990); *see Empire Plow Co. v. United States*, 11 CIT 847, 854, 675 F.Supp. 1348, 1354 (1987). It is a basic requirement of administrative law that "a party aggrieved by an agency decision or action must exhaust its remedies for relief on that issue at the agency level before it may contest the decision or action before a reviewing court." *Ceramica Regiomontana S.A. v. United States*, 14 CIT ——, Slip Op. 90–107 at 4, 1990 WL 160258 (Oct. 17, 1990) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952)).

The Commission, however, does not preclude a party before it from presenting arguments in the alternative. Calabrian failed to argue in the proceeding below that sodium metabisulfite, sodium bisulfite, and sodium thiosulfate all constitute separate like products. If Calabrian made the strategic decision in the administrative proceeding, for whatever reason, not to raise the asserted differences between sodium metabisulfite and sodium bisulfite, it is estopped from changing that strategy now and arguing for the first time that sodium metabisulfite and sodium bisulfite constitute separate like products because it is clear that during the course of the investigation the definition of the like product was at issue before the Commission. As this Court has ruled, "[w]here the issue has not been raised at the administrative level, as in the present circumstances, a litigant must not be allowed to circumvent the requirement of exhausting its administrative

remedies by raising the issue in its civil action." *Empire Plow*, 11 CIT at 854, 675 F.Supp. at 1354 (citation omitted).

This Court finds that Plaintiff had an adequate opportunity before the Commission to make its separate like product argument. Plaintiff however opted not to do so and, thus, failed to exhaust its administrative remedies because the issue was not raised before the Commission, and none of the policies underlying the exhaustion doctrine support granting a waiver in this case.[6] Consequently, this Court holds that Plaintiff is estopped from arguing that the Commission's like product determination is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## B. Material Injury

Next, Plaintiff asserts that the Commission's Determination fails to satisfy the first and second prongs of the *American Lamb* standard. As to the first prong, *American Lamb* states that a negative preliminary injury determination can be sustained "only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury[.]" 4 Fed.Cir. (T) at 55, 785 F.2d at 1001.

The statute directs the Commission to determine whether there is a reasonable indication that "an industry in the United States is materially injured." 19 U.S.C. § 1671b(a)(1)(A) (1988). Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1988). In undertaking its injury analysis, the Commission first examines the condition of the domestic industry. The Commission is instructed by the statute to consider "all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. § 1677(7)(C)(iii) (1988). The statute sets forth specific factors concerning production and capacity data, pricing information, financial information, and research

---

**6.** The courts have recognized limited exceptions to the rule mandating the exhaustion of administrative remedies such as: if pursuing administrative relief would be futile, if the agency does not have the power to remedy, or if the agency relief would be manifestly inadequate. *PPG Indus., Inc. v. United States*, 14 CIT ——, ——, 746 F.Supp. 119, 137 (1990).

and development which the Commission must consider. *Id.* The legislative history of the statute makes clear, however, that "[n]either the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide." S.Rep. No. 249, *supra,* at 88.

■ First, Plaintiff maintains that the Commission's negative determination is arbitrary, capricious, and lacking in any rational basis in fact because the administrative record when viewed as a whole does not contain clear and convincing evidence of no material injury. Plaintiff points out several factors in the determination such as capacity decline, fluctuation of inventories, and "mixed" employment data. Determination at 11–12.

In this case, the Commission first considered domestic capacity to produce sodium metabisulfite and domestic production indicia. Regarding capacity first, the Commission noted that capacity fluctuated over the period of investigation. *Id.* at 11. Industry-wide capacity to produce sodium metabisulfite rose from 270.5 million pounds in 1987 to 282.5 million pounds in 1988, but declined in the following year to 260.0 million pounds. *Id.* at A–15, tbl. 3. The downward trend continued into the beginning of 1990, with capacity falling from 76.3 million pounds in the first quarter of 1989 to 65.0 million pounds in the same period of 1990. *Id.* The decline in production capacity from 1988 to 1989 reflects the closure by Hoechst Celanese, a domestic industry, of its Portsmouth, Virginia plant in 1989. *Id.*[7] In *American Spring Wire Corp. v. United States,* the Court affirmed a Commission determination of no material injury where domestic production capacity increased over the period of investigation, notwithstanding a decline in the interim period. 8 CIT 20, 24–26, 590 F.Supp. 1273,

1278–79 (1984), *aff'd,* 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985).

The Commission next looked to production statistics, noting that "domestic production increased steadily through the period of investigation." Determination at 11–12. In fact, production increased notwithstanding the closure of the Celanese plant. Production of sodium metabisulfite increased from approximately 130 million pounds in 1987 to 141 million pounds in 1988 and then to 143 million pounds in 1989. *Id.* at A–15, tbl. 3. The upward trend continued into 1990 when 36 million pounds were produced in the first quarter of 1990 as compared to 34 million in the first quarter of 1989. *Id.* This Court has found increasing production to support a finding of no material injury. *Copperweld Corp. v. United States,* 12 CIT 148, 164–66, 682 F.Supp. 552, 568–70 (1988); *National Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 774–75, 696 F.Supp. 642, 645–46 (1988).

The Commission also found that domestic capacity utilization increased throughout the period of investigation. Determination at 12. Capacity utilization rose steadily over the period of investigation from 48 percent in 1987 to 50 percent in 1988 and to 55 percent in 1989. Determination at A–15, tbl. 3. During interim 1990, capacity utilization jumped to 56 percent from 45 percent in interim 1989. *Id.* While some of the increase in capacity utilization was due to the decline in capacity in 1989, production also increased during the period under investigation. That total domestic production continued to increase, despite the cessation of production by Celanese and the resultant decline in total capacity, supports the Commission's conclusion that there was no reasonable indication that the domestic industry, as a whole, was materially injured.

As to inventories, the Commission pointed out that United States producers' inventories fluctuated over the period of investi-

---

**7.** Celanese lists many reasons for leaving the industry, including "[t]he announced intention of Tenneco Minerals Corporation (Green River, Wyoming), the entry into the market of Calabrian Chemical Company (Port Neches, Texas), increased import pressures and stated excess capacity of General Chemical Corporation (North Claymont, Delaware)." A.R.Doc. 1 at exh. 3; Determination at A–13 n. 35.

gation. *See id.* at A–18, tbl. 7. The Commission found the evidence concerning shipments to inventories ratio probative of a robust industry. *Id.* at 12. In fact, the Commission found no evidence of abnormally high or increasing ratios of shipments to inventories over the period of investigation.

Plaintiff also asserts that the Commission mischaracterized the employment data contained in the administrative record. The Commission's determination found that the employment data in the administrative record supported a finding of no reasonable indication of material injury. The Commission majority stated:

> Employment data submitted in confidence are mixed but generally support our finding of a robust industry. For example, data submitted to the Commission indicates that the number of workers in the U.S. industry rose through calendar year 1989, whereas total hours worked fluctuated.

*Id.* at 12 and A–19, tbl. 8.

It appears that the Plaintiff would have the Commission compare information of inventory levels and employment data in a different manner. It is well established, however, that "[t]he Commission ... is not required to make explicit findings with respect to all the factors that it considers." *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1083, 699 F.Supp. 938, 947 (1988), *citing Gifford–Hill Cement Co. v. United States*, 9 CIT 357, 369–70, 615 F.Supp. 577, 587 (1985).

■ Plaintiff further contends that the Commission's failure to consider the condition of individual companies within the domestic industry is arbitrary, capricious, and otherwise contrary to law. Plaintiff relies on the cessation of sodium metabisulfite production of Hoechst–Celanese due to, *inter alia,* increased import pressures.

The statute directs the Commission to determine "whether there is a reasonable indication that an industry in the United States is materially injured." 19 U.S.C.

§ 1671b(a)(1)(A). "Industry" is defined as "the domestic producers *as a whole* of a like product." 19 U.S.C. § 1677(4)(A) (1988) (emphasis added).

That Congress intended for the Commission to consider the entire industry is clear from the legislative history of the 1979 Act. Congress endorsed the Commission's practice prior to the passage of the 1979 Act, in which "the phrase 'an industry in the United States' ... has been interpreted by the ITC as referring to all the domestic producer facilities engaged in the production of" the like product. S.Rep. No. 249, *supra,* at 82. The 1979 Act codified the Commission's practice of interpreting "the term industry generally [to] mean the domestic producers as a whole of the like product." *Id.*[8]

This Court has repeatedly affirmed this interpretation of the statute. As this Court noted in *Copperweld,* referring to the language of the statute cited above,

> [t]his language makes manifestly clear that Congress intended the ITC determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports. This language defies the suggestion that the ITC must make a disaggregated analysis of material injury.

12 CIT at 165–66, 682 F.Supp. at 569; *accord Sandvik AB v. United States,* 13 CIT 738, 745–46, 721 F.Supp. 1322, 1330 (1989), *aff'd,* 8 Fed.Cir. (T) ——, 904 F.2d 46 (1990) (affirming Commission determination based on aggregate analysis of the domestic industry); *National Ass'n of Mirror Mfrs.,* 12 CIT at 778, 696 F.Supp. at 647–48 ("the Commission acted according to law in considering the domestic unfinished mirror industry as a whole where no allegation of regional industries was made under 19 U.S.C. § 1677(4)(C)").

In this case, Plaintiff neither suggested nor did the Commission find that the domestic industry producing sodium metabisulfite was a regional industry. This Court finds that the Commission acted in accordance with the statute and did not act arbi-

---

8. 19 U.S.C. § 1677(4)(A). The 1979 Act did create an exception for regional industries. *See* 19 U.S.C. § 1677(4)(C). No regional industry was alleged or found to exist in these investigations.

trarily, capriciously, or otherwise not in accordance with law when it examined the industry as a whole.

This Court finds that the Commission considered the information of record on each of the statutory factors, and concluded that it evidenced no reasonable indication of material injury to the domestic industry. This Court holds that the employment data, the financial data, exhibiting strong operating income levels and operating income margins, together with increasing production and shipments, provide clear and convincing evidence for the Commission's determination of no reasonable indication of material injury.

■ As to the second prong of the *American Lamb* standard, Plaintiff argues that the Commission failed to make the specific finding that no likelihood exists that contrary evidence would arise in a final investigation. 4 Fed.Cir. (T) at 55, 785 F.2d at 1001. Specifically, Plaintiff asserts that the financial data relied upon by the Commission in its preliminary determination was incomplete because two domestic producers were not able to provide financial data in the format required by the Commission for compilation into industrywide data.

The Commission received and reviewed additional financial data concerning one of the domestic producers (Celanese) after the staff report was submitted to the Commission. *See Wells Mfg. Co. v. United States,* 11 CIT 911, 921, 677 F.Supp. 1239, 1247 (1987) (Commission considers all evidence in the record even if it is not contained in the staff report). The Commission must analyze the "best information available" contained in the record at the time of its determination and judge the likelihood that evidence contrary to that already gathered will arise in a final investigation that would support an affirmative determination. *See* 19 U.S.C. § 1677e(c) (1988). The Commission received almost complete financial information from the domestic industry and concluded that the financial information for the industry as a whole clearly showed that the industry was highly profitable. Determination at 12.

This Court holds that the Commission did not act arbitrarily, capriciously, or abuse its discretion in its review of the financial information before it. The Commission is required to consider the best information available to it during the preliminary investigation due to short statutory time limits. It appears that the Commission examined a great percentage of the financial information, also taking into account the late submissions of one of the industries, and reasonably concluded based on that information that the industry was profitable.

C. Threat of Material Injury

Having found no reasonable indication of material injury to the domestic industry, the Commission turned to whether or not there was a reasonable indication that the domestic industry was threatened with material injury by reason of the subject imports. The Commission found that, in light of the current healthy state of the industry, the unlikelihood of significant increased imports, and no probability of adverse price effects, there was no reasonable indication of a real threat of imminent material injury to the domestic industry. Determination at 13–17.

■ First, Plaintiff argues that the Commission erred in considering the present condition of the domestic industry to be a determinative factor in its threat of material and in permitting the nonstatutory factor to outweigh evidence in the administrative record of statutory factors indicative of material injury.

Although the statute does not define "threat of material injury," it specifically instructs the Commission to "consider, among other relevant economic factors

(I) If a subsidy is involved, such information as may be presented to it by [Commerce] as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the [Agreement on Subsidies and Countervailing Measures]),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a signifi-

cant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury,

(VIII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 1671 or 1673 of this title or to final orders under section 1671e or 1673e of this title, are also used to produce the merchandise under investigation,

(IX) [provisions relating to agricultural products], [and]

(X) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

19 U.S.C. § 1677(7)(F)(i) (1988). The Commission makes its determination "on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii).

The Commission majority first noted that the domestic industry was "robust" and, therefore, "not significantly vulnerable to a threat of material injury." Determination at 14. Plaintiff argues that the Commission erred in considering the current state of the domestic industry in undertaking its threat analysis. Contrary to Plaintiff's assertion, Defendant maintains that the current state of the industry was not determinative of the Commission's threat analysis. The Commission, however, did consider the current condition of the industry as a relevant factor for its consideration. The statutory factors primarily serve as guidelines for the Commission's analysis of the likely impact of future imports.

Although the statute specifies certain factors that the Commission must consider in its threat analysis, the Commission may consider "other relevant economic factors." 19 U.S.C. § 1677(7)(F). The current condition of an industry is relevant in the evaluation of whether imports will, in the imminent future, force that industry into a state of material injury. Furthermore, the statute admonishes the Commission that the threat of injury must be real and the actual material injury imminent to warrant an affirmative determination. 19 U.S.C. § 1677(7)(F)(ii). The present relative health of an industry is an important indicator as to the imminence of material injury. A healthy industry can better withstand competition from future imports than can one that is functioning close to a state of material injury. *See Metallverken Nederland, B.V. v. United States,* 14 CIT ——, ——, 744 F.Supp. 281, 286–87 (1990) (the Court approved Commissioner Rohr's consideration of the present state of the industry in assessing the threat of material injury to the domestic industry).

The legislative history to the 1979 Act also supports the Commission's analysis in this regard. The House Committee on Ways and Means, in addressing the threat provision, noted that "[i]n examining threat of material injury, the ITC will determine the likelihood of a particular situation developing into actual material injury." H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979) U.S.Code Cong. & Admin.News 1979, p. 381. In the legislative history to the Trade and Tariff Act of 1984, Congress acknowledged that "a determination of threat will require a careful assessment of

identifiable current trends and competitive conditions in the marketplace." H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984) U.S.Code Cong. & Admin.News 1984, pp. 4910, 5291. In discussing the latest amendments to the statute in 1988, the Senate Finance Committee further explained that the purpose of the threat provision of the statute was to prevent injury before it actually occurred, but only if "the threat of injury is real and injury is imminent." S.Rep. No. 249, *supra*, at 89, U.S.Code Cong. & Admin.News 1979, pp. 381, 475.

A strong indication of the likelihood of material injury to an industry in the near future is its present state. A robust industry, as indicated by such factors as increasing production, increasing capacity utilization rates, increasing shipments and strong profits, is less likely to become materially injured in the near future than an industry characterized by declining production and negative profit margins.

Moreover, the propriety of considering the present condition of the industry in a threat analysis has been upheld by this Court. As was stated in *Rhone Poulenc, S.A. v. United States,* there is "no inconsistency between the requirement that the factors indicating present injury be considered when examining threat and Congress' statement that the absence of any indicia of present injury should not be considered conclusive that threat of injury does not exist." 8 CIT 47, 52, 592 F.Supp. 1318, 1323–24 (1984); *see Metallverken,* 14 CIT at ——, 744 F.Supp. at 286–87.

■ This Court holds that the Commission's consideration of the present condition of the industry is supported by the language of the statute and the legislative history. Such consideration, however, only establishes the background against which the Commission considers the likely effect of future imports, based on consideration of the factors set forth in the statute.

■ Next the Commission considered the statutory factors in turn. As to the factor pertaining to subsidies, the Commission found that this factor was only relevant to imports of sodium metabisulfite from Turkey. Determination at 15. Although the Commission found that some of the subsidies alleged may be export subsidies, this factor alone could only provide limited support for an affirmative finding. *See* Determination at A–6. In consideration of all the other factors and as well as the prosperous condition of the domestic industry, the Commission concluded that the alleged subsidies were insufficient to indicate even a reasonable indication of threat of material injury. *Id.* at 15.

The Commission, in considering production capacity, determined that almost all other producers in the subject countries are utilizing capacity at high rates, and that no likelihood exists for a significant increase in exports to the United States due to either unutilized or underutilized capacity. *See id.* at A–26 to A–30, tbls. 17–23. As to China, the Commission concluded based upon best information available from the record that there was no reasonable indication that any underutilized or unutilized capacity exists which may lead to increased imports in the immediate future sufficient to threaten material injury. *Id.* at 15 and A–27 to A–28, tbls. 18 & 19.

The Commission noted a rise in market share held by the imports, but found that there was no indication that imports would rise rapidly to an injurious level. *Id.* at 15 and A–38, tbl. 27.

The Commission did find some evidence of price suppression, but determined that due to a lack of significant underselling of the domestic product, they found no probability that imports will adversely affect prices. *Id.* at 15–16. Furthermore, the Commission determined that both import and domestic prices rose over the period of investigation. *Id.* at 16.

Pertaining to inventories, the Commission found that confidential data on the size of the inventories of the subject imports supported a negative threat finding. *Id.* They considered the factor of product shifting and found no likelihood of a threat. *Id.* Moreover, the Commission found no actual or potential effects on research and development efforts in the domestic industry. *Id.* Finally, the Commission found no

other adverse trends or evidence of dumping in third country markets. *Id.*

This Court holds that the Commission's finding of no reasonable indication of threat of material injury of imports from the subject countries was based on clear and convincing evidence on the record and has a rational basis in fact and, therefore, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

For the reasons given above, it is hereby

ORDERED that Plaintiff's Motion for Judgment Upon the Agency Record is Denied. This action is dismissed.