SLIP OP. 06-159

# UNITED STATES COURT OF INTERNATIONAL TRADE

CONNECTICUT STEEL CORP., et al.,

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

LINCOLN ELECTRIC CO., et. al.,

Defendants-Intervenor.

**Before: Gregory W. Carman, Judge**

Court No. 06-00034

[Plaintiffs' Motion for Judgement on the Agency Record is denied.]

Kelley Drye Collier Shannon (Paul C. Rosenthal, Kathleen W. Cannon and R. Alan Luberda) for Plaintiffs.

James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel, U.S. International Trade Commission (Jonathan J. Engler), for Defendant.

Arnold & Porter LLP (Lawrence A. Schneider and Michael T. Shor), Covington & Burling (David Grace and Harvey M. Applebaum), deKieffer & Horgan (Marc E. Montalbine and Merritt R. Blakeslee), Vorys, Sater, Seymour and Pease LLP (Kimberly R. Young and Frederick P. Waite), and Wilkie, Farr & Gallagher, LLP (Daniel L. Porter, Matthew P. McCullough and William H. Barringer) for Defendants-Intervenor.

## OPINION AND ORDER

**CARMAN, JUDGE:**  This matter is before this Court on Plaintiffs' Motion for Judgment on the Agency Record Pursuant to Rule 56.2.  This Court, having considered Plaintiffs' Motion and memorandum in support thereof, Defendant's and Defendants-Intervenor's responses, Plaintiffs' reply, the Administrative Record, and all other papers submitted herein, finds that the International Trade Commission's ("ITC") negative preliminary determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Therefore, Plaintiffs' Motion is denied.

## PROCEDURAL HISTORY

In November 2005, Connecticut Steel Corporation, Gerdau Ameristeel U.S., Inc., Keystone Consolidated Industries, Inc., Mittal Steel U.S.A. Georgetown, and Rocky Mountain Steel Mills ("Plaintiffs" or, collectively, "Connecticut Steel"), all domestic companies, filed a petition with the ITC and the International Trade Administration of the U.S. Department of Commerce.  The companies alleged that imports of carbon and certain steel wire rod ("steel wire rod") from China, Germany and Turkey were being, or were likely to be, sold in the United States at less than fair value, and that such imports were materially injuring or threatening to injure the competing domestic industry.  Carbon and Certain Alloy Steel Wire Rod from Germany, Turkey, and the People's Republic of China, 70 Fed. Reg. 72,781 (Dep't Commerce Dec. 7, 2005) (initiation of antidumping duty investigations).  After completing a preliminary investigation of steel wire rod, the ITC unanimously found "no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of

[the] subject imports." Carbon and Certain Alloy Steel Wire Rod from China, Germany, and

Turkey, USITC Pub. 3832, Inv. Nos. 731-TA-1099-1101, at 3 (Jan. 2006) (Preliminary)

("Prelim. Report"). The ITC published the negative preliminary injury determination in the

Federal Register on January 3, 2006. Carbon and Certain Alloy Steel Wire Rod from China,

Germany, and Turkey, 71 Fed. Reg. 132 (ITC Jan. 3, 2006) (preliminary determination). The

case arrived at this Court after Connecticut Steel timely appealed, challenging the ITC's

preliminary determination. This matter is before this Court on Plaintiffs' Motion for Judgment

on the Agency Record Pursuant to Rule 56.2.


## FACTUAL BACKGROUND

On November 18, 2005, the ITC commenced its preliminary investigation, Carbon and

Certain Alloy Steel Wire Rod from China, Germany, and Turkey, 70 Fed. Reg. 69,988 (ITC

Nov. 18, 2005) (preliminary investigation), and sent questionnaires to both foreign and domestic

producers of steel wire rod in conjunction therewith. (Pls'. Mem. of Law in Supp. of Mot. for J.

on the Agency R. ("Pls.' Mem.") 4.) On November 29, 2005, the ITC provided copies of the

submitted questionnaire responses to all parties to assist their preparation for a public conference

on the matter to be held on December 1, 2005. (Id.)

On December 1, 2005, a domestic producer that had submitted a timely questionnaire

response contacted the ITC, stating that its questionnaire response "was not completed properly."

(Confidential R. ("Conf. R.") at 137.) The domestic producer indicated that it would submit a

revised questionnaire response to the ITC by December 9, 2005, which it did. (Id.) The ITC

included the domestic producer's revised questionnaire response in the preliminary investigation.

The revised questionnaire response is central to the dispute between Connecticut Steel and the ITC.

The revised questionnaire response differs from the original in several respects. While the original questionnaire has many blank pages and unanswered questions, almost every page of the revised questionnaire response is completed. (Compare Conf. R. at 62 (original questionnaire response), with Conf. R. at 164 (revised questionnaire response).) For some questions, the domestic producer included supplemental tables in its answer. (Conf. R. at 164: 14, 18, 31.) In addition, some reported data differ between the original and the revised questionnaire response. Further, the domestic producer's chief financial officer certified that the information in the revised questionnaire response "is complete and correct to the best of [his] knowledge," while the original lacks certification. (Conf. R. at 164: 1.)

Because the revised questionnaire response was submitted after the December 6, 2005, deadline for post-conference briefs, none of the parties was able to see or comment on the revised questionnaire response before the ITC voted on the petition. (Pls.' Mem. 8; see also Mem. of Def. U.S. Int'l Trade Comm'n in Opp'n to Pls.' R. 56.2 Mot. for J. on the Agency R. ("Def.'s Mem.") 11.) However, between December 12 and 15, 2005, two ITC staff members contacted the domestic producer with questions about the revised questionnaire response. (Conf. R. at 155, 197.) A week later, on December 23, 2005, the ITC unanimously held that "there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of [steel wire rod] imports from China, Germany, and Turkey." Prelim. Report at 3.

In the Preliminary Report, the ITC found that the volume of imports was not significant, "either in absolute terms or relative to domestic production and consumption." Prelim. Report at 24. The ITC explained that "although U.S. producers' market share . . . declined somewhat in 2004, we do not attribute the decline in significant part to the subject imports, but to the domestic industry's own capacity constraints and production outages during a period of particularly strong demand." Id. at 23. The Preliminary Report also stated that the ITC failed to find that "subject imports had any significant adverse price effects," a finding based in part on record high prices in 2004, "when subject import volumes . . . reached their highest market share." Id. at 25. In addition, the ITC found "a general lack of correlation" between subject imports and the domestic industry's profitability. Id. at 29. Moreover, capital expenditures, an indication of industry health, increased from 2003 to 2004, and "continued to rise in interim 2005." Id.

## PARTIES' CONTENTIONS

A.     Connecticut Steel's Contentions

   **1.     The ITC Relied on Inaccurate Data Contained in the Revised Questionnaire Response**

Connecticut Steel asserts that the ITC's negative preliminary determination should be remanded. According the Connecticut Steel, the ITC's finding that there was no "reasonable indication" that the domestic industry is "material[ly] injured . . . by reason of" the subject steel wire rod imports from China, Germany, and Turkey is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. (Pls.' Mem. 35.) Particularly, Connecticut

Steel protests that the ITC should not have used the revised questionnaire response data in making the negative preliminary determination.  (Id. at 1, 11.)

Connecticut Steel first argues that the revised questionnaire response data are inaccurate. The data, Connecticut Steel maintains, are "erroneous on their face," "inconsistent" with the company's Original Questionnaire, and "aberrational as compared to data of the other U.S. producers." (Id. at 11, 14, 18.)  Connecticut Steel highlights that the domestic producer included information on products that were outside the scope of the ITC's investigation in the revised questionnaire response.  (Id. at 11-12.)  Moreover, Connecticut Steel insists, there are "consistent and dramatic differences" between the revised questionnaire response data and data reported by the rest of the industry that "provide further reason to question the validity of the data reported." (Id. at 21.)  Connecticut Steel believes that--given what it sees as multiple problems in the data-- the ITC should have "probe[d] the accuracy" of the data. (Id. at 18.)  Instead, Connecticut Steel argues, the questionnaire response was not "questioned, reconciled or verified."  (Id. at 15.)

Connecticut Steel further alleges that the ITC relied on the supposedly inaccurate data in its analysis, which "had a significant effect on the [ITC's] injury analysis." (Id. at 30.)  In fact, Connecticut Steel argues, "there is indeed substantial doubt as to whether the [ITC] would have reached the same, negative result absent reliance" on the revised questionnaire response. (Id. at 32.)

**2.     The ITC Deprived Connecticut Steel of Its Due Process Rights to Comment on the Revised Questionnaire Response**

In addition, Connecticut Steel argues that its inability to comment on the data from the revised questionnaire response, as it was submitted after the public conference and the deadline for the post-conference briefs, "deprived [it] of . . . due process rights and meaningful participation" in the investigation process. (Id. at 25.) Preempting Defendants-Intervenor's claim of estoppel discussed below, Connecticut Steel further states that "it cannot be argued that there was a 'failure to exhaust' administrative remedies, as the domestic industry was precluded from raising these arguments below precisely because the [ITC] did not release the [revised questionnaire response] to the parties." (Id. at 27 n.12.)

For the reasons stated above, Connecticut Steel believes that the ITC "could not reasonably conclude that there was no likelihood that contrary evidence would arise in a final investigation." (Id. at 33.) Connecticut Steel suggests that remand is appropriate to "provide the [ITC] with additional time to review and correct the inaccuracies in the data cited, to obtain comments from the parties, and to ensure that this investigation is not prematurely terminated based on flawed data." (Id. at 34.)

**3.     The ITC's Determination Cannot be Sustained on Causation Analysis Alone**

In response to arguments raised by the ITC and Defendants-Intervenor, Connecticut Steel also refutes the argument that the ITC need only find either no reasonable indication of material injury or no reasonable indication that subject imports caused material injury[1] to adequately

---

[1] This Court notes that Connecticut Steel did not specifically appeal the ITC's finding that the subject imports did not cause material injury to the domestic industry.

support a negative preliminary determination.  (Pls.' Reply Br. 12.)  Connecticut Steel contends

rather that the ITC's determination "may not be sustained on the basis of its causation analysis

alone."  (Id.)  It argues that the "condition of the domestic industry, and particularly whether it is

in a 'vulnerable' state, is an essential element of the [ITC's] inquiry."  (Id. at 13.)  Thus,

Connecticut Steel argues that the ITC's "finding on causation cannot independently sustain an

overall negative injury decision if its finding as to the condition of the industry is flawed."  (Id.)

B.      The ITC's Contentions

        1.      **Connecticut Steel Does Not Challenge the ITC's Core Findings**

        The ITC disagrees with Connecticut Steel's contention that its negative preliminary

determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.  Fundamentally, the ITC argues that Connecticut Steel failed to "challenge the findings that

form the core of the [ITC's] negative preliminary determination."  (Def.'s Mem. 15.)  The ITC

asserts that Connecticut Steel "ma[d]e no challenge to the [ITC's] finding that the volume of

subject imports was not significant during the period."  (Id.)  The ITC also alleges that

Connecticut Steel did not challenge the finding that "the subject imports did not have a

significant effect on domestic prices during the period of investigation."  (Id. at 16.)

Furthermore, the ITC maintains, Connecticut Steel offers no serious challenge to the finding

"that there was no apparent causal link between changes in the industry's profitability levels and

the prices and volume trends of the subject imports during the period of investigation."[2]  (Id. at

_____

        [2] Defendants-Intervenor raise a similar argument.  They argue that the ITC "may issue a
negative determination if it finds either (i) no reasonable indication of injury or threat of injury
or (ii) no reasonable indication of a causal connection between subject imports and injury or
threat of injury."  (Mem. in Supp. of Opp'n of Def.-Intervenors to Pls.' Mem. for J. on the

17.)  The ITC argues that Connecticut Steel's failure to challenge many key findings in the ITC's

preliminary report "make[s] clear that the [ITC's] determination should be affirmed as being

consistent with the clear weight of the evidence." (Id. at 18.)

### 2.      The Data from the Revised Questionnaire Response Are Accurate

Further, the ITC challenges on several grounds Connecticut Steel's characterization of

the revised questionnaire response as inaccurate.  First, the ITC explains that the inconsistencies

between the original and revised questionnaire response did not cause the ITC to doubt the

accuracy of the revised questionnaire response because the domestic producer "had disavowed

its contents" and therefore the ITC "did not accord [the domestic producer's] withdrawn

questionnaire response any weight at all."  (Id. at 19.)   Second, the ITC contends that the

domestic producer's profitability was neither "radical" nor "aberrational" (Pls.' Mem. 18), as its

profitability "was consistent with that of many domestic producers" (Id. at 24).  Third, where it

had questions about the data, the ITC "satisfied itself as to the accuracy of" the revised

questionnaire response by both speaking to the domestic producer and "corroborating

information in the response with publicly available data."[3] (Id. at 21.)  Finally, the ITC argues

that the "small quantity of out-of-scope merchandise" included in the revised questionnaire

_____

Agency R. ("Defs.-Int. Mem.") 9.)  Because Connecticut Steel challenged only the former
finding in its appeal, Defendants-Intervenor reason that the ITC's negative preliminary
determination should be affirmed on the latter ground.  (See id. at 10.)

    [3] According to the ITC, it "examined the company's web site, which emphasized the
company's production of high-end products that sell at a premium" to corroborate a company
official's explanation of the domestic producer's profitability.  (Id. at 21.)

response "was insignificant and did not affect the fundamental findings on which the [ITC] based its negative determination." (Id. at 28.)

### 3.        The ITC Did Not Violate Connecticut Steel's Due Process Rights

Responding to Connecticut Steel's allegation, the ITC defends that it did not violate Connecticut Steel's due process rights by not allowing comments on the revised questionnaire response. The ITC points out that "parties do not have the right to rebut information on the record beyond the rights granted by statute and governing regulations. In this case, neither the statute nor the [ITC's] regulations grant[s] any party the right to receive all questionnaires responses before the [ITC's] vote in a preliminary determination." (Id. at 30-31 (footnote omitted).) Moreover, the ITC argues, Connecticut Steel "cannot now reasonably argue that [it was] precluded from complaining about this data issue" (Id. at 28 n.2) because "[m]ost of the alleged 'problems' that [Connecticut Steel] now raise[s] . . . were present" in the original questionnaire response (Id. at 31). The ITC hypothesizes that, because the original questionnaire response "yielded the 'right result,'" Connecticut Steel "maintained a telling silence . . . at the time." (Id. at 32.)

### C.        Defendant-Intervenor's Contentions

### 1.        Connecticut Steel Is Estopped from Challenging the Revised Questionnaire Response As It Failed to Do So Before the ITC

Defendants-Intervenor echo many of the arguments made by the ITC and set out above. Additionally, Defendants-Intervenor challenge whether Connecticut Steel is allowed to question the validity of the revised questionnaire response, "as [it] failed to raise before the [ITC] the identical alleged problems" in the original questionnaire response. (Defs.-Int. Mem. 33.) For

example, the original questionnaire response included non-subject merchandise, one of the

grounds on which Connecticut Steel rests its claim of the revised questionnaire response's

inaccuracy. (Id. at 34.) "Because the bulk of the complained-of 'defects' in the revised

questionnaire response were also present in the Initial Questionnaire, and [Connecticut Steel]

remained silent," Defendants-Intervenor argue that Connecticut Steel may not now rely on those

"defects" in support of its appeal. (Id.)


**JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000).


**STANDARD OF REVIEW**

This Court will uphold the ITC's negative preliminary determination unless it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Tariff

Act of 1930, § 516A(b)(1)(A), as amended, 19 U.S.C. § 1516a(b)(1)(A)(2000). In reviewing

whether an agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," the court applies "a narrow judicial review standard," consistent with

"traditional administrative law principles." Am. Lamb Co. v. United States, 785 F.2d 994, 1004

(Fed. Cir. 1986) (quotation and citation omitted); see also 5 U.S.C. §706(2)(A). "The court is

not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton

Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Rather, the court's role is to ascertain whether

there is a "'rational nexus between the facts found and the choices made,'" (Calabrian Corp. v.

U. S. Int'l Trade Comm'n, 16 CIT 342, 345, 749 F. Supp. 377 (1992) (quoting  Jeannette Sheet

Glass Corp. v. United States, 11 CIT 10, 15, 654 F. Supp. 179 (1987)), and only reverse an

agency decision where "'there has been a clear error of judgment.'" Tex. Crushed Stone Co. v.

United States, 35 F.3d 1535, 1540 (Fed. Cir. 1994) (quoting Overton Park, 401 U.S. at 416).

In a preliminary determination, the ITC's task is to determine "whether there is a

reasonable indication that–(A) an industry in the United States–(i) is materially injured, or (ii)

threatened with material injury by reason of imports of the subject merchandise . . . ." 19 U.S.C.

§ 1673b(a)(1) (2000).  The ITC, with endorsement from reviewing courts, has consistently

construed the statute to find no "reasonable indication" of material injury when:  "(1) the record

as a whole contains clear and convincing evidence that there is no material injury or threat of

such injury; and (2) no likelihood exists that contrary evidence will arise in a final

investigation." Am. Lamb, 785 F.2d at 1001.  Therefore, the question before this Court is

whether, relying on the record as a whole, the ITC committed clear error in finding that there

was no reasonable indication of material injury to the domestic industry by reason of subject

imports, and that there was no likelihood that contrary evidence would be developed in a final

investigation.  See id.

## DISCUSSION

A.     Estoppel

The first issue for this Court to decide, raised by Defendants-Intervenor, is whether

Connecticut Steel is estopped from disputing the accuracy of the revised questionnaire response,

due to its failure to raise those concerns before the ITC.  "It is a basic requirement of

administrative law that a party aggrieved by an agency decision or action must exhaust its

remedies for relief on that issue at the agency level before it may contest the decision or action

before a reviewing court." Calabrian, 16 CIT at 347 (quotation and citation omitted).

Connecticut Steel argues that it was precluded from raising its concerns about the revised

questionnaire response because the ITC did not release the revised questionnaire response to the

parties prior to issuing its negative determination. (Pls.' Mem. 27 n.2.)  While this Court

acknowledges that Connecticut Steel did not have an opportunity to raise any concerns about the

revised questionnaire response, most of the alleged defects were present in the original

questionnaire response, which was available to the parties.  For example, in its appeal,

Connecticut Steel argues that the revised questionnaire response contains non-subject

merchandise. (Id. at 11.)  However, the original questionnaire response, which Connecticut Steel

embraced in its post-conference briefs, also contained non-subject merchandise.  (See Conf. R. at

62: 9.)

Similarly, Connecticut Steel alleges that the revised questionnaire response was

suspicious because it did not match an earlier production volume estimate that the company had

given to one of the plaintiffs.  However, Connecticut Steel did not raise the variance in the

production volume estimates in connection with the original questionnaire response, which

likewise did not match the estimate.  (See Pls.' Mem. 14; Conf. R. at 62.)  In fact, the difference

between the estimated and reported numbers was larger in original questionnaire response than

in the revised questionnaire response.  (Compare Pls.' Mem. 14; with Conf. R. at 62; and Conf.

R. at 164.)

As this court has noted,  "[i]f [the plaintiff] made the strategic decision in the

administrative proceeding, for whatever reason, not to raise the [issue], it is estopped from

changing that strategy now . . . . [A] litigant must not be allowed to circumvent the requirement of exhausting its administrative remedies by raising the issue in its civil action." Calabrian, 16 CIT at 347 (quotation and citation omitted). Connecticut Steel had the opportunity to challenge the original questionnaire response on the same grounds it now challenges the revised questionnaire response. Accordingly, this Court holds that Connecticut Steel is estopped from challenging the revised questionnaire response on the grounds that: (i) it contains non-subject merchandise, or (ii) the production data reported differed from the estimate previously given by the domestic producer.

Connecticut Steel also challenges the revised questionnaire response on four other grounds: (i) the domestic producer gave an illogical explanation for the revision; (ii) the domestic producer's data are aberrational as compared to the data of other U.S. companies; (iii) the revised questionnaire response did not undergo a probing inquiry by the ITC due to its late submission, and (iv) the revised questionnaire response reflects "estimates" rather than actual data.[4] Putting aside the persuasive power of these arguments, this Court rules that Connecticut Steel is not estopped from raising these arguments here, as these grounds were not present at-- and thus could not have been challenged before--the ITC.

---

[4] Because some of the petitioners provided estimates in their own questionnaire responses, Connecticut Steel's challenge appears to be disingenuous. However, because "estimate" was not written on the original questionnaire response as was the case with the revised questionnaire response, this Court is not willing to preclude a challenge on that ground.

B.      Legal Standard for Reasonable Indication of Material Injury

During a preliminary investigation, the ITC evaluates "whether there is a reasonable

indication that-(A) an industry in the United States-(i) is materially injured[5] . . . by reason of

imports of the subject merchandise."  19 U.S.C. § 1673b(a)(1).  To determine "whether there is a

reasonable indication of material injury, the ITC shall consider the imports': (1) volume, (2)

effect on prices for the domestic like product, and (3) impact on the domestic industry."  Comm.

for Fair Coke Trade v. United States, Slip Op. 03-56, 2003 Ct. Int'l Trade LEXIS 58 at *7-8

(CIT May 20, 2003) (citing 19 U.S.C. at § 1677(7)(B)(i)(I)-(II) (2000)).  In making its

determination, "the [ITC] may weigh all the evidence and resolve conflicts in the evidence."

Conn. Steel Corp. v. United States, 18 CIT 313, 315, 852 F. Supp. 1061 (1994); see also Am.

Lamb, 785 F.2d at 1002-04.

Each of the grounds raised in Connecticut Steel's appeal is aimed at discrediting a single

piece of evidence, the revised questionnaire response.  To be sure, the accuracy of each piece of

evidence bears upon whether the record as a whole survives judicial scrutiny.  However,

Connecticut Steel misinterprets the standard for a negative preliminary determination.  "Rather

than requiring each piece of evidence to be found clear and convincing, the standard approved by

American Lamb requires that 'the record as a whole' contain clear and convincing evidence that

there is no material injury . . . ."  Conn. Steel, 18 CIT at 315-16 (quoting Am. Lamb, 785 F.2d at

1001).  Here, Connecticut Steel has not shown that the ITC erred in relying on the revised

_____

          [5] The statute also requires the ITC to evaluate whether the domestic industry "is
threatened with material injury," or "the establishment of an industry . . . is materially retarded"
by subject imports.  19 U.S.C. § 1673b(a)(1).  However, Connecticut Steel challenges only the
ITC's finding on actual injury to the domestic industry.

questionnaire response, much less that the record as a whole does not reasonably support the

ITC's negative preliminary determination.

This Court finds that the ITC reasonably relied on the data included in the revised

questionnaire response. First, the ITC should not have viewed the revised questionnaire

response with skepticism as a result of differences between the original and the revised

questionnaire responses, as Connecticut Steel argues. (See Pls.' Mem. 14.) The domestic

producer disavowed the original questionnaire response, informing the ITC that it "was not

completed properly." (Conf. R. at 137.) Because some production volume numbers are lower in

the revised questionnaire response than in the original, Connecticut Steel argues that the

domestic producer's explanation is "illogical." (Pls.' Mem. 16.) Yet, it is the data in the original

questionnaire response that the ITC correctly disregarded. The original questionnaire response

was incomplete in that many pages were left blank, and no one from the company certified the

accuracy of the questionnaire.[6]  In contrast, almost every question was answered fully in the

revised questionnaire response; it included supplemental tables; and it was certified by an officer

of the domestic producer. This Court finds that the ITC acted reasonably by both concluding

that the revised questionnaire response was reliable, and that the original response was

unreliable.

Connecticut Steel also alleges that the domestic producer's data are "aberrational" as

compared to those of other domestic producers, arguing that this makes the data unreliable.

---

[6] Certification is an ITC requirement.  19 CFR § 206.8(a) (2006) ("Any person
submitting factual information . . . for the consideration of the [ITC] in the course of an
investigation . . . must certify that such information is accurate and complete to the best of the
submitter's knowledge.").

(Pls.' Mem. 18.) Determining whether certain data are aberrational is a factual line-drawing exercise particularly well-suited for the expertise of an agency like the ITC, rather than the courts. In determining that the revised questionnaire response was accurate, the ITC did not blindly accept the data, as Connecticut Steel suggests. Rather, the ITC satisfied itself as to the accuracy of certain answers in the revised questionnaire response by speaking to the domestic producer and corroborating answers with outside sources. In essence, by arguing that the ITC determination should be remanded on the ground that data are aberrational, Connecticut Steel "request[s] the court to reweigh the evidence." Conn. Steel, 18 CIT at 315. But the role of the court is "to ascertain whether there was a rational basis for the determination, not to decide whether it would have made a different decision on the basis of the evidence." Id.

Finally, Connecticut Steel challenges the reliability of the revised questionnaire response on the ground that the domestic producer reported its data in the form of estimates, rather than confirmed values. However, the revised questionnaire data is not rendered less reliable than other responses merely because the domestic producer reported estimates rather than confirmed values. In fact, the ITC instructs companies to provide estimates where "information is not available from [company] records in exactly the form requested." (Public R. at 6: 4). Moreover, some of the petitioners challenging the practice in this investigation relied on estimates in their own responses. (Conf. R. at 20, 26.) Because the ITC did not commit clear error by relying on the revised questionnaire response, this Court will not disturb the determination that there was no reasonable indication of material harm to the domestic steel wire rod industry by reason of imports from China, Germany and Turkey.

C.      Due Process

Regardless of the merits of the ITC's preliminary determination, this Court must also address whether the determination must be remanded for a violation of Connecticut Steel's procedural due process rights.  "It is well established that when considering a procedural due process issue,  the court must first determine whether a protected property or liberty interest exists, and if such an interest exists, then determine what procedures are necessary to protect that interest."  Int'l Trading Co. v. United States, 24 CIT 596, 609, 110 F. Supp. 2d 977 (2000) (quotation and citation omitted).  A party must have "a legitimate claim of entitlement" to a property interest for it to be protected, not merely a "unilateral expectation" of protection.  Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  Further, property interests "are not created by the Constitution.  Rather, they are created and their dimensions defined by existing rules or understandings that stem from an independent source" such as a statute or regulation.  Id.

To the extent that domestic producers, like Connecticut Steel, have a constitutionally protected interest in antidumping investigations, the governing statute and applicable regulations set out the parties' procedural rights.  For example, interested parties are entitled to submit to the ITC factual information and legal argument regarding an investigation.  See 19 C.F.R. § 207.15 (2006).  Indeed, the ITC allowed Connecticut Steel to participate in the investigation by submitting briefs and by attending the public conference held before the ITC's vote on the matter.

However, the right Connecticut Steel claims, to comment on all information submitted to the ITC in a preliminary investigation, is not found in either the applicable statute or regulations.  See Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1071 (1995) ("The court does

not find that the statute or applicable regulation guarantees" parties a right to rebut

submissions.); Gen. Motors Corp. v. United States, 17 CIT 697, 704, 827 F. Supp. 774 (1993)

(the ITC made no provision for rebuttals).  The absence of an explicit right to comment on all

submissions in a preliminary investigation contrasts with legislation regarding final

investigations where the ITC must "provide the parties with a final opportunity to comment on

the information obtained by . . . the [ITC] . . . upon which the parties have not previously had an

opportunity to comment."  19 U.S.C. § 1677m(g).  Even Connecticut Steel acknowledges that

"parties may not have an absolute right to comment on all information submitted in an

investigation . . . ."  (Pls.' Mem. 25.)  Given the tight timetable,[7] it is understandable that

Congress would deny some time-consuming procedural rights during a preliminary investigation.

Because Connecticut Steel was able to participate meaningfully in the ITC preliminary

investigation, this Court rejects Connecticut Steel's due process challenge to the ITC's refusal to

allow comments on the revised questionnaire response before making its preliminary

determination.


## CONCLUSION

The parties having fully briefed their arguments and this Court finding no reason

therefor, Connecticut Steel's Motion for Oral Argument in denied.

For the reasons cited herein, this Court holds that the ITC's negative preliminary

determination in Carbon and Certain Alloy Steel Wire Rod from China, Germany, and Turkey,

---

[7] The ITC has only 45 days to collect data, analyze them, and make a preliminary
determination.  19 U.S.C. § 1673b(a)(2).

71 Fed. Reg. 132 (ITC Jan. 3, 2006) (preliminary determination), was not arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.  Accordingly, this Court sustains

the ITC's preliminary determination on this matter and denies Connecticut Steel's  Motion for

Judgment on the Agency Record.  Judgment will enter accordingly.

            /s/  Gregory W. Carman
Gregory W. Carman

Dated:  October 31, 2006
        New York, New York